Lansing *v.* Russell.

---

### LANSING and others *vs.* RUSSELL and others.

The certificate of the clerk of a court is not evidence of the existence of a judgment, except in those cases where it is made evidence by statute.

Independent of any statutory provision, the proper way to prove the existence of a judgment is by the production of the record itself, or of an exemplification thereof, or of a sworn copy of such record.

In what cases the testimony of experts is proper, upon the trial of an issue as to the genuineness of the grantor's signature to a deed; and what credit such testimony is entitled to.

Where the verdict of the jury, upon the trial of issues sent to a court of law to be tried, is against the weight of evidence, a new trial will be granted by the court directing the trial.

Issues were awarded, to try the question as to the genuineness of a grantor's signature to two deeds, one to his daughter and another to his son-in-law, and as to the competency of the grantor to execute such deeds; and the jury having found in favor of the validity of both deeds, a motion was made for a new trial; upon which motion it appeared that it was the grantor's intention to make the shares of all his children in his estate equal. And the deed to his daughter professing to have been given with the view of putting her upon an equality with his other children, and the court being satisfied, from the evidence, that the grantor could not have understood the effect of that deed upon the division of his property, and the grantees having failed to prove that equality among the grantor's children would be produced by allowing both deeds to stand, a new trial of the issues was ordered, so far as they related to the deed to the grantor's daughter.

The testimony of experts, who have been in the habit of examining the marks and signatures of aged, as well as of middle aged and of young persons, for the purpose

Lansing *v.* Russell.

of determining the genuineness of such marks and signatures, is proper; to show that the mark to an instrument alleged to be a forgery, could not have been the genuine mark of a very aged man, but was a simulated mark.

THIS was an application by the complainants for a new trial of the issues awarded in this cause by the court of chancery. The object of the complainant's bill was to set aside two conveyances executed by C. Lansing, a short time previous to his death; on the ground that they were obtained from him by fraud, or that they were in fact never executed by him. C. Lansing died in 1842, in the 90th year of his age. The deeds purported to be executed by him on the 30th of November previous, and were witnessed by W. A. Russell, a son of the grantees in the respective deeds. One of the deeds was to D. Russell, the son-in-law of the grantor and conveyed a valuable farm in the town of Salem, Washington county. The other was to Mrs. Russell, the daughter of the grantor, and was for his homestead at Lansingburg, and reserved to the grantor a life estate therein.

The Salem farm had formerly belonged to D. Russell, and he was residing on it with his family at the time of the date of the conveyance thereof to him, in November, 1841. In October, 1820, Russell had conveyed the Salem farm to his father-in-law, by a deed which upon its face was absolute; and which purported to have been given for the consideration of $10,600 paid by the grantee therein. The defendant, Russell, however, alleged that it was in fact given merely as a security, to his father-in-law, for moneys which the latter was to advance, and for responsibilities which he had agreed to assume to and for him, the grantor; and that it was agreed between them that whenever the amount of such advances and responsibilities, with interest, should be repaid or discharged by Russell, his father-in-law should reconvey the premises to him. Russell also alleged, in his answer to the bill in this cause, that subsequent to the giving of the deed of 1820, as such security, he paid to his father-in-law large sums of money, and transferred to him bonds and mortgages and other property in payment of such advances and responsibilities, previous to the autumn of

1837, to nearly the whole amount thereof; that the parties then accounted together as to such advances and payments, when it was found that there was about $500 due to C. Lansing on account of his advances and responsibilities, including interest; which amount was, either then or immediately afterwards, paid to him; and that he then promised to reconvey the farm at any time, when he should be requested to do so. And the defendant Russell alleged that the conveyance of the Salem farm, in November, 1841, was made in conformity with that promise, and to carry into effect the original agreement of October, 1820, that the farm should only be held as security, and should be reconveyed upon payment of the advances made to the grantor therein.

The deed to Mrs. Russell, of her father's homestead, purported to have been made in consideration of natural love and affection, and to place her upon terms of equality with the other children of the grantor. It also contained covenants of warranty, and a special provision that if the covenants were broken Mrs. Russell and her heirs and assigns were to be entitled to the sum of $10,000 as liquidated damages, "thereby making her share of the property of the said Cornelius Lansing, equal in amount to the individual shares of his other children."

The deeds of November, 1841, were not subscribed with the name of the grantor, but purported to have been executed by him by making his mark, or cross, opposite the seal. The bill alleged that at the time those deeds purported to have been executed by C. Lansing, he had no power, either of body or of mind, to transact business, or to hear or comprehend the contents of the papers, if they were read to him; that the marks affixed to the deeds were not made by him, or if made by his hand it was by *compulsion*, and by his hand being held and guided by D. Russell, or some other person, by mere contrivance, and without the voluntary act or consent of C. Lansing. In reply to this part of the bill, the answer, which was not on oath, denied the incompetency of the grantor to make the conveyances, at the time they purported to have been executed, or that they were not the voluntary and rational act of the grantor; and it

also denied that his hand was guided by the defendant, or by any other person, or that the execution thereof was procured or obtained by compulsion, or by any fraudulent management or imposition, as charged in the bill.

The following issues were awarded, for the settlement of the matters of fact in dispute in the cause, and were tried before Judge Ruggles, at the Dutchess circuit, in November, 1845:

1. Was Cornelius Lansing legally incompetent, by reason of unsoundness of mind, or mental incapacity, to execute a deed at the time when the two deeds of November, 1841, were obtained, or when either of them was obtained?

2. Were the deeds of November, 1841, falsely made, forged and counterfeited; or was either of them falsely made, forged and counterfeited?

3. Were the signatures and marks purporting to be made to those deeds, by C. Lansing, or the signature or mark to either of the deeds, procured and obtained by compulsion, or by the fraudulent management and imposition of D. Russell and his wife, or of either of them, or of any other person by the procurement of Russell and his wife, or of one of them?

The complainants gave in evidence the will of C. Lansing, made in September, 1836, and a codicil to the same dated the 10th of July thereafter; both of which were admitted to probate in May, 1842, as valid testamentary dispositions of the testator's real and personal estate. By the will the testator gave to his son, A. C. Lansing, the income of one eighth of his real and personal estate; the one half for his own use, and the other half in trust, to receive such income for his children, born and to be born, share and share alike, and to their heirs; to be paid to those who were of age at the death of the testator, one year thereafter, and to the others as they respectively arrived at the age of twenty-one; with the accumulations thereof. And the remainder in that eighth of his estate he gave to his son, A. C. Lansing, in trust, to convey, pay and deliver over to his children the one half part thereof when they should be of the age of twenty-one respectively, or within one year after the death of the testator, and the other half thereof to the children of A. C.

Lansing *v.* Russell.

Lansing, born and to be born, share and share alike, after the termination of his life estate therein.  He gave a similar interest in all respects, in another eighth of his estate, to his son D. C. Lansing, and his family ; and a similar interest to his son J. C. Lansing, except that as to the last he vested the title in his executors as trustees, instead of vesting it in the son, for the benefit of himself and his children.

One other eighth he gave to or for the use of the children or descendants of his deceased daughter, formerly the wife of D. Allen, deceased.  One other eighth to the surviving husband of his deceased daughter Helen Alvord, the income of one half for the use of himself for life, and the income of the other half and the remainder in fee in the whole, in trust for the children of Mrs. Alvord.  Another eighth he gave to his son-in-law G. Tracy, in trust, as to the income of the one half for himself and his wife during their joint lives, and for the survivor during life ; and as to the income of the other half, and the remainder in the whole, in trust for the children of Mrs. Tracy, as they arrived at the age of twenty-one respectively.  He gave another eighth to his son-in-law A. Seymour, under similar limitations in all respects.  The remaining one eighth he gave to his executors, and the survivor of them, in trust, to pay over one half of the income to his daughter, Mrs. Russell, during her life, and if her husband survived her, then to pay over that half of the income to him for life ; and as to the other half of the income, and the remainder in fee in the whole eighth, in trust for the children of Mrs. Russell.  The testator also directed his executors to retain out of the share of J. C. Lansing and his children $6000, and out of the share of Mrs. Russell and her children $10,000, to be in the hands of his executors as a part of the testator's personal estate.  He also directed that his son D. C. Lansing should pay to the executors $1050, and that his son-in-law G. Tracy should pay to the executors $1740 ; which sums were charged upon the shares devised to them and their children. And he made his three sons, and his four sons-in-law then living, and two other persons, the executors of his will.

Among other witnesses on the part of the complainants, J

Van Schoonhoven was called, and testified that in the summer or fall of 1841, he went to C. Lansing, at the request of D. Russell, for the purpose of inducing him to make a reconveyance of the Salem farm. The witness stated to C. Lansing that he called at the request of Russell to see if he would not reconvey the Salem property before his death, as it would cause trouble afterwards. He replied, "you know it is all right, I have made it all right, I shall make no change in my property." The deeds in controversy were produced upon the trial, and shown to several witnesses who had been, or then were, cashiers of banks and experts in detecting forgeries and counterfeits, and to one who had been in the habit of seeing papers executed by aged pensioners, by making their marks thereto, as well as by middle aged persons upon applications for naturalization. And such experts all testified that the marks made to these deeds were not the genuine marks of a person of the age of C. Lansing at the time those deeds purported to have been executed. The testimony was objected to by the defendant's counsel, but admitted by the judge. A great many witnesses were then examined on the part of the complainants and of the defendants as to the state of the mental and physical faculties of C. Lansing, and his capacity to make the deeds in question, his declarations as to the holding of the deed of the Salem farm as security for advances made to and responsibilities assumed for Russell, and as to the amount of advances to and of the repayments made by Russell, and as to the accounts between D. Russell and his father-in-law, at different times subsequent to the giving the deed of the Salem farm in 1820, and before the date of the deeds in controversy.

The defendants thereupon called their son W. A. Russell, the subscribing witness to the deeds; who testified, in substance, that he went with his father to the house of his grandfather on the day the deeds were executed, and that his father went into the house while the witness put out his team; that when he went into the room, where his grandfather usually staid, he found him and D. Russell together, sitting by the fire and talking in relation to their business. The first conversa

tion the witness recollected was that his grandfather asked D. Russell if he had that receipt with him. He said he had, and produced it, and it was read. This receipt, the witness testified, he had seen in the hands of his father, in the fall of 1837, that the body of it was in the hand-writing of his grandfather, and it was signed by him; that by it he acknowledged to have received the sum of $2700, and stated the balance due to be $500; on receipt of which last mentioned sum he was to reconvey the Salem farm to D. Russell. After the receipt had been read, Mr. Lansing asked D. Russell if he had prepared, or had got, the deeds? The latter said he had, and produced them. Mr. Lansing then requested that they should be read, and Mr. Russell accordingly read the deed which was to be given to Mrs. Russell, and they were then called out to tea; after tea they went back again and the other deed was read. Mr. Lansing then wanted that part of the deed to Mrs. Russell which stated the object of making the deed, to be read over again, and it was done. He then asked if it reserved the use of the house to him during his lifetime, and being told that it did, said "that's right," and moved to the table to execute them. Witness' father then asked Mr. Lansing if he understood them, and he said that he did, "one is a deed to Alida of part of my homestead, and the other is a deed to you of the Salem farm." Mr. Lansing said, "give me the pen and show me where to put it," and then said, "steady my hand, Russell." Witness' father took hold of Mr. Lansing's hand and assisted him to make his mark, first to one of the deeds and then to the other. The witness then asked his grandfather if he acknowledged those deeds to be his hand and seal for the purposes therein mentioned? and being answered in the affirmative, he signed his name to them as a witness. After sitting fifteen or twenty minutes, Mr. Lansing said, "Russell, I want that receipt; I ought to have it, it belongs to me now." Mr. Russell replied, "you may have it if you want it;" and went and got a paper which witness supposed to be the receipt, and delivered it to his grandfather. The next morning, when witness was going away, he went to take leave of his grandfather; who then told him to tell hi

mother that he had given her a deed of his old place there, and she must come down and stay with him; that he had tried to get his children together to settle their matters, but could not do it, and that it was the only way he had left to do justice to her.

The complainants objected to the giving of parol evidence of the contents of the receipt of 1837; but notice having been given to the complainants to produce it, and D. Russell having testified that it was delivered up to C. Lansing the evening of the execution of the deeds, and that he had not afterwards seen it, the judge decided that parol evidence of its contents was proper. S. Russell, a brother of D. Russell, also testified to having seen the receipt in the hands of his brother as early as 1836; that he then lent his note to his brother David for $500, which C. Lansing afterwards told him he held. This witness also testified that in December, 1841, or January, 1842, he called to see Mr. Lansing, and was told by him that he need not give himself any trouble about the note, for his brother had paid it; and that he had deeded to him the Salem farm and settled all his affairs with him, and had given Mrs. Russell a part of the place on which he, C. Lansing, lived. A witness was then called on the part of the complainants to show that this last conversation could not have occurred at the time stated by S. Russell. The testimony of the subscribing witness to the deeds was also contradicted in some particulars. In the course of the trial, the complainants, for the purpose of proving the state of the accounts between D. Russell and his father-in-law, offered in evidence a statement in the hand-writing of G. Tracy, one of the complainants; which statement was rejected by the judge. They also offered in evidence a note for $600, dated in October, 1820, given by C. Lansing to J. Sturges; with a memorandum thereon, in the hand-writing of the former, stating that it was for D. Russell, and was included in the consideration money of the deed for the Salem farm; which evidence was also excluded by the judge. They also, for the purpose of proving that D. Russell was very much embarrassed between the time of giving the original deed to his father-in-

law of the Salem farm, and the date of the deeds in question, offered in evidence a certificate of the clerk of the supreme court, that a large number of judgments were rendered against him during that time. That evidence was objected to, and was excluded by the court.

The judge, in his charge to the jury, stated that in relation to the first issue they must decide whether C. Lansing, at the date of the deeds in question, was mentally incapable of executing them. And if they were satisfied he had not mind enough left to enable him to understand the several provisions in the deeds, and to comprehend their meaning, they should find the affirmative of the first issue ; if otherwise, in the negative ; that the burthen of establishing the incapacity of C. Lansing was upon the complainants. In respect to the question whether the deeds were forgeries, his honor stated that it was a grave charge, not only involving the title to a large property but implicating the characters of one of the defendants, and of his son and brother ; that the evidence to sustain such a charge should be strong and satisfactory ; that if the evidence left the question in doubt, the former character and standing of D. Russell should have great weight to turn the scale ; that the circumstances tending to show the improbability that C. Lansing would have executed these deeds were to be taken into consideration by the jury, but were not conclusive, as he might have changed his mind. In respect to the testimony of the witnesses who gave their opinions as experts, the judge told the jury it was for them to say whether the skill of these witnesses could detect false marks ; that in respect to hand-writing, skill could be acquired, although it was not the safest kind of proof ; that it was much more difficult, nay, was it not impossible to judge whether a mark was genuine or simulated ? Could any skill enable a witness to distinguish between the mark of an old and that of a young man, and was it safe to rely upon such opinions ? He said a mark had not, and could not have any fixed character ; that Mr. Lansing was old, blind, and infirm, and no two marks of his were alike ; that such evidence was the slightest he had ever known to show forgery ; that the

answer of D. Russell was relied on by the complainants. in which he stated that he did not guide Mr. Lansing's hand; although it was now proved by his son that he did guide it. In commenting on this the judge remarked that the answer was in response to a charge, in the bill, that the hand of C. Lansing was *forcibly guided;* that it was not the vital question in the case. His honor also told the jury that to establish a forgery they must discredit the testimony of the son and of the brother of D. Russell; and that it was for the jury to say whether the circumstances relied on to discredit their testimony were material; that, certainly, there were very extraordinary circumstances attending the execution of the deeds; the property conveyed was large, the old gentleman was blind, deaf and very infirm; and it would have been far better for the reputation of the defendant to have had a commissioner, or some third person present, not related to the defendant, to witness the execution; that the defendant and his son were there alone, the deeds were taken away immediately, and the fact of their execution was not made known during the life of the grantor; and it was most extraordinary that the deeds were not made public until more than a year after Mr. Lansing's death. He said these circumstances might properly be taken into consideration by the jury in making up their verdict upon the second question presented for their decision, but that they applied with still more force to the third question.

The judge before whom the issues were tried then directed the attention of the jury to the question embraced in the third issue; whether the signature or mark of C. Lansing to the deeds in controversy, or either of them, were obtained by imposition or fraudulent management? The jury were instructed that in determining this question the capacity of the grantor in the deeds was to be viewed in a different manner from what it was in deciding the first issue; that although a man might not be technically of unsound mind, yet if his intellect was greatly weakened by disease or old age, it was not supposed that he had a mind fully adequate to the transaction of business; and weakness of understanding constituted a material ingredient in

Lansing *v.* Russell.

determining the question whether a deed had been obtained by fraud, imposition, or undue influence; that if it was improbable that such deeds would have been executed by Mr. Lansing in health, and when he was in a situation to take care of his own business, his weak and infirm state at the time they were given afforded strong evidence of fraud. And after recapitulating the leading facts of the case which tended to show that the deed of the homestead to Mrs. Russell, in particular, was inconsistent with the settled determination of her father, in relation to the disposition of his property among his children and descendants, which he had formed when in the full possession of his faculties, his honor concluded by intimating a very strong opinion that the recital in that deed, that the $10,000, which was to be paid to her as liquidated damages if the title failed, would make her share of her father's property equal in amount to the several shares of his other children, was not true; and that if the deed was correctly read to the grantor he was not in a situation to understand its contents and effect.

*D. Buel & J. Pierson,* for the complainants.

*S. Stevens,* for D. Russell and wife.

THE CHANCELLOR. Upon the questions of law which arose upon the trial of the issues in this case, I do not think there was any error in the decisions of the circuit judge which would justify this court in granting a new trial. The certificate of the clerk of the supreme court was not evidence of the existence of judgments against Russell. It is true, such a certificate is by statute made evidence of a judgment, under the redemption law; and perhaps in some other cases specially provided for. But, independent of any statutory provision, the proper way to prove the existence of a judgment is by the production of the record itself, or an exemplification thereof, or a sworn copy.

The statement of Russell's indebtedness to his father-in-law, made out in the hand-writing of one of the complainants, was properly excluded as evidence against the defendants. There

was nothing to show that it was made out at the time the Salem farm was conveyed by Russell in 1820, or that it was in existence previous to the controversy between these parties.

Nor was the endorsement or memorandum upon the Sturges note any evidence, as against the defendants, of the fact stated therein. Certainly in a controversy between Russell and his father-in-law, in relation to the amount of the indebtedness of the former, the latter could not make his own memorandum evidence against the adverse party. And if the testator himself could not have used it as evidence, in a suit instituted by himself to set aside these deeds as obtained from him by fraud and imposition, his devisees cannot use it as evidence, in a suit brought by them, for the same purpose, after his death.

I think the judge erred in intimating so strongly to the jury that in his opinion no skill could enable an expert to distinguish between the mark of an old man and that of a young one And if the decision of this cause turned upon the question whether the marks upon the deeds in controversy were made by the unaided hand of C. Lansing, in the situation in which he is proved to have been in November, 1841, I should feel bound to grant a new trial ; upon the ground that these remarks of the judge had misled the jury. I think the testimony of the experts, who had been in the habit of examining signatures and marks of young persons as well as of very aged ones, to prove that the marks to these deeds could not have been the genuine marks of the unaided hand of old age and decrepitude, was properly received, upon the trial, as legal evidence to establish that fact. Those who have seen the genuine signature of the patriot Stephen Hopkins, upon the declaration of our independence, and have compared it with Benjamin O. Tyler's admirable fac simile of the signatures to that instrument, can see at once that the hand of age and disease may be successfully imitated by one in the prime of life and in the full possession of his muscular powers. But the venerable patriot whose head and whose heart were still strong and sound, although his hand trembled from age and disease, could not have imitated, successfully, the natural signature of B. O. Tyler. And upon ex-

amining the marks to these deeds, with a microscope, and comparing them with the marks of Mr. Lansing to other papers made about the same time, any one who has ever turned his attention to such subjects will be satisfied that the marks to these deeds could not have been made by his unaided hand. This part of the charge of the judge, however, becomes unimportant, when taken in connection with the testimony of the subscribing witness to the deeds. For he swears that the marks were made by his father's assistance in guiding the hand of the grantor, and at the request of the latter. It is a very common thing, in such cases, for the party who is to execute an instrument as a marksman, merely to touch the pen, while the mark is really made by the hand that controls and guides the pen. If that was the case here, it would have been perfectly natural for Mr. Russell to try to make the mark so as to resemble that made by the trembling hand of an aged person. And if so, the mark itself would probably exhibit the regular rolling curves which the microscope shows to exist in the marks to both of these deeds.

The remarks of the judge that the answer of Mr. Russell, denying that he guided the hand of the grantor in the deeds, was in response to the charge, in the bill, that Mr. Lansing's hand was forcibly guided, and was not the vital question in the cause, could not have been intended, by the judge, to convey an intimation to the jury that the charge made in the bill was not vital. For the charge was, in substance, that the hand of the grantor was forcibly guided, so as to compel him to make the marks against his will; which would have been a forgery as well as a fraud. But the judge undoubtedly intended to tell the jury that it was not the vital question in the cause whether the hand of Mr. Lansing was guided by Mr. Russell in making the marks; that the vital question, and the one which was intended to be denied in the answer, was whether the hand of the grantor was forcibly guided.

The remaining question to be considered is whether the verdict, upon any or all of these issues, is so much against the evidence as to make it proper to award a new trial on that

ground. And here, instead of examining the testimony at length, I shall merely state the conclusions at which I have arrived. In the first place, I am satisfied that the grantor in the deeds was not technically of unsound mind, so as to be mentally incapable of making a valid deed. The acts of some of the complainants show that they did not consider him as non compos mentis. The verdict upon the first issue, therefore, was not against the weight of evidence. I have also arrived at the conclusion that the subscribing witness to the deeds has testified honestly, and has neither been guilty of forgery nor of perjury. He is not impeached, nor is his testimony contradicted, in any essential particular, so as to render it necessary for the court to conclude that either he or the witnesses on the other side have intentionally perverted the truth; though the particular circumstances have been misrecollected by one or the other of them. The story told by him is not inconsistent with probability. The jury, therefore, were not bound to believe that his testimony was false. It necessarily follows from the conclusion at which I have arrived as to his testimony, that these conveyances were not forgeries, but that the marks of the grantor were put to them with his concurrence or assent; although he may have entirely misapprehended the actual meaning and effect of one or both of the deeds. And in coming to this conclusion, I lay out of question the testimony of Solomon Russell as to his conversation with Mr. Lansing after the date of these deeds. For his testimony is contradicted by a witness who swears that Russell could not have seen the old gentleman, so as to have had a conversation with him, at the time stated.

I am also satisfied, from the evidence, that the Salem farm was intended to be held, by C. Lansing, only as a security for the advances made to, and the responsibilities which he had assumed for, Mr. Russell. And upon the trial of this issue it was competent to prove that the deed was in equity a mortgage merely; though at law it vested the title to the farm in the grantee. From the evidence I conclude also that the state of the accounts between the parties was such that Mrs. Russell,

and her husband and children, would not have been put upon a footing of equality with the other branches of her father's family if her father had retained the Salem farm and had also charged her ten thousand dollars for his advances. On the other hand, I am satisfied from the evidence that D. Russell had not paid the whole amount of the advances and responsibilities, which Lansing had made and assumed for him, at the time of the giving of the receipt or agreement, of 1837, to reconvey the Salem farm. I think the proof shows that something like $10,000, including interest, must then have been due; and that equality between the different branches of the family would not be produced by conveying the Salem farm to Mr. Russell, and the homestead of her father to Mrs. Russell. Such equality would probably have been produced if the Salem farm had been reconveyed to Mr. Russell and the will had remained as it was; leaving the homestead to be divided among all of the eight children of Mr. Lansing, and their descendants.

The receipt which was given in the fall of 1837, subsequent to the making of the will, and after its contents were known, strengthens this supposition. By that will Mrs. Russell's eighth of the testator's property was charged with $10,000 of the advances made and responsibilities assumed for her husband. It would therefore be perfectly natural, as well as reasonable, for Mr. Russell to say to his father-in-law, "You have already charged my wife with $10,000 of my indebtedness, by your will. Now give me a writing that upon my paying to you the balance, beyond the $10,000, you will reconvey to me the Salem farm; and let the will stand as it is." And if the balance then due was but $500, which it probably was, it would have been almost a matter of course for the old gentleman to have given such a receipt, if he had made up his mind not to interfere with the provisions of the will. The testimony of Van Schoonhoven corroborates this view of the case. For the application to him, by Russell, was to get him to persuade the old gentleman to convey the Salem farm; not to ask him to alter his will. And if Mr. Lansing had already adjusted the balance in this way,

and made it all right by giving his son-in-law a written agreement to reconvey the Salem farm when the balance beyond the $10,000 was paid, his answer to the application of Van Schoonhoven was perfectly sensible and proper. How or when the $500, stated in the receipt as the balance to be paid, was discharged, does not appear from the testimony; though Solomon Russell says Mr. Lansing told him it was paid. It is probable, therefore, that the deed of the Salem farm was under standingly executed, and ought not to be disturbed.

The other deed, which professes to be given to make Mrs. Russell equal with the other children, and without any other consideration of value, cannot be sustained if she had already been made equal by the agreement to reconvey the Salem farm; leaving unpaid $10,000 of the advances. And under the circumstances, and considering the situation in which Mr. Lansing was when it was executed, I think the defendants were bound to show how the shares of the estate were to be made equal, among the several children, by the giving of this deed. No explanation on this subject was given at the time the deeds were executed. But I can imagine that it would have been made equal if the very strange covenant, at the close of this deed to Mrs. Russell, had been a condition that the grantee should pay to the executors $10,000, out of her share of the estate, for this homestead; thereby making her property equal in amount with the other children. This is the part of the deed that the old gentleman wanted read again. And his deafness and infirmities were such that I cannot believe he finally understood the effect of it to be what it now is.

Believing, as I do, that the grantor could not have understood the effect of this deed upon the division of his property, and the defendants having failed to prove that all the grantor's advances had been paid, so that this deed would equalize the shares of his estate between the grantee and the other members of the family, I must direct a new trial of this case, so far as relates to the deed of the homestead farm to Mrs. Russell, unless the defendants D. Russell and wife, within thirty days after the entry of the order upon this decision, deliver to the

solicitor of the complainants a stipulation that a decree may be entered setting aside the deed to Mrs. Russell, without costs to either party, as against the other, in this suit. If such a stipulation is not given, there must be a new trial; at the circuit to be held in the county of Saratoga. And the costs of this application, in that event, are to abide the result of the suit