---

(35 Misc. Rep. 702.)

### In re HOPKINS' WILL.

(Surrogate's Court, Westchester County. August, 1901.)

1. WILL—REVOCATION—EVIDENCE.
    The evidence showed that two days after the funeral of testator three persons carefully searched a desk in the office of the corporation, which testator, in common with others, used at times, but found no will; that three hours later one of these persons, who was an employé of the corporation, found by accident, in the same desk, the will, inclosed in an envelope, with the testator's initials, but his signature had been canceled by marks which an expert testified were not those of testator. The will was in favor of beneficiaries to whom testator would have been likely to have given his property. *Held*, that the presumption of the revocation was rebutted by the circumstances.

2. SAME—CANCELLATION.
    As, under the evidence, the cancellation must be construed to have been made by a stranger, and there was no proof of authority given him by the testator, nor proof of revocation by two witnesses, the cancellation was insufficient for purposes of revocation.

3. SAME—DECLARATIONS OF TESTATOR.
    Declarations of testator subsequent to the execution of the will, showing that he believed himself to be testate down to the day of his death, are inadmissible.

4. HARMLESS ERROR.
    Where evidence is admitted by surrogate subject to a motion to strike out, and is thereafter stricken out, no prejudice is shown.

In the matter of the probate of the will of Robert E. Hopkins, deceased. Probate decreed.

Clarence S. Davison, Henry C. Henderson, James MacGregor Smith, G. R. Cook, Edgcomb & Rafferty, William C. Reddy, and Alexander & Magill, for probate.

Joseph W. Middlebrook, special guardian of Robert E. Hopkins, Jr., contestant

SILKMAN, S. The paper propounded was executed by the alleged testator with all the formalities required by law on November 14, 1891. It was filed for probate by Fanny W. Hopkins, his widow, and when so filed the signature at the end of the will was canceled by 14 vertical marks made with pen and ink through it. Mr. Hopkins was a man of wealth, consisting largely of personal property. He left a widow, the petitioner, and one child, a son now about 13 years old, his only heir at law. Under the paper propounded the widow is the chief beneficiary. The special guardian appointed by the court, in pursuance of his duty, filed objections to the probate, alleging that the instrument was canceled by Mr. Hopkins with intention to revoke the same, and that he died intestate. During the trial of the proceeding quite a little testimony was offered as to the declarations of the testator subsequent to the execution of the paper propounded, tending to show that down to the day of his death he believed himself to be testate. This evidence was

strenuously objected to by the special guardian, upon the ground that it was incompetent. Nevertheless, it was admitted, subject to a motion to strike out, and upon that motion the decision of the court was reserved; to all of which rulings the special guardian excepted.

Ordinarily, it is the duty of the court to rule finally at the time when objections and motions are made in respect of the admission of evidence, and the failure to so rule at the time would be error. Nevertheless, there are exceptions to this practice in trials before the court without a jury, and particularly so in the surrogate's court, where pleadings do not exist, and the rules relating thereto do not obtain. It is frequently the case that not until the close of the evidence upon one side or the other can it be determined whether the evidence offered is competent or not. Take the case at bar. If the proponents had in mind to show that subsequent to the execution of the will the alleged testator became incompetent to perform a testamentary act, his declarations and conduct could have been offered as competent evidence upon that issue. In the absence of pleadings it could not be anticipated what might be in the mind of counsel, or the ultimate object of the testimony; and so it follows that the reservation by the court of its ruling was correct, unless the contestant's case was prejudiced thereby, in that he was precluded from presenting evidence tending to explain or contradict the testimony objected to, or prevented from cross-examining witnesses in respect thereto. As I have concluded to sustain the special guardian's objections, and strike out all the testimony showing or tending to show declarations by the alleged testator, no possible prejudice can result to the case of the special guardian by reason of the court's reservation of its decision. The proponents have not shown, nor have they attempted to show, that Mr. Hopkins was at any time incompetent to make or revoke a will, and as the law has been recently settled in this state and in the United States courts to the effect that such declarations are incompetent upon the issue whether testator intended to revoke the paper propounded, evidence thereof cannot be considered. In re Kennedy's Will, 167 N. Y. 163, 60 N. E. 442; Throckmorton v. Holt, 21 Sup. Ct. 474, 45 L. Ed. 663. The testimony of Mr. Warren, at pages 18, 19, and 20 (S. M.); that part of the answer of Dr. Coutant, at page 37 (S. M.), "He told me that he had made his will some time before, and saw no special reason for changing it;" the testimony of Alexander Chambers, at pages 56, 57, and 62 (S. M.); and the testimony of Townsend B. Roe, pages 112, 113, 114, and 115 (S. M.),—is stricken out, and exceptions given to proponents.

In determining whether Mr. Hopkins made the marks through his signature, and, if he did, was it with an intention to revoke his will? we must keep constantly in mind the sanctity of the instrument, and the safeguards that the law has thrown around the act of execution and the act of revocation. The Revised Statutes provide (2 Rev. St. p. 64, § 42):

"No will in writing except in the cases hereinafter mentioned, nor any part thereof, shall be revoked or altered, otherwise than by some other will

in writing, or some other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person in his presence, by his direction and consent; and when so done by another person, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses."

It will be noticed that the statute contemplates a cancellation either by the hand of the testator or by the hand of another, and, where by the hand of another, by testator's direction and consent. Moreover, such cancellation and the direction to cancel must be proved by at least two witnesses. The statute does not provide for any presumptions, but leaves the circumstances to be proven. The special guardian argues—and with much ability—that, where a will is found with the signature erased, there arises a presumption that it was done by the testator, and that to overcome such presumption there must be evidence that it was done by some other hand; and cites In re Philp's Will (Sup.) 19 N. Y. Supp. 13, and In re Clark's Will, 1 Tuck. 445, as authorities directly in point, and cites as analogous Hard v. Ashley, 88 Hun, 103, 34 N. Y. Supp. 583, and Collyer v. Collyer, 110 N. Y. 481, 18 N. E. 110, 6 Am. St. Rep. 405, where the question was that of an alleged lost will. No one questions but that these cases were correctly decided upon their own peculiar facts, and it is the facts of each case which control. The statute was enacted to prevent fraud, and not to invite it. Therefore such a broad presumption which would make the accomplishment of a fraudulent cancellation the easier would contravene the spirit of the act. But if we observe the distinction between a legal presumption and a legal inference, which terms are sometimes inadvertently used as synonymous, we can thoroughly harmonize the spirit of the statute and the authorities. A presumed fact is one taken for granted and accepted as a result of human experience and general knowledge, while an inference is the conclusion drawn from the proof or admission of circumstances which, by reason of the same human experience and knowledge, would naturally lead to it. A man is presumed to regard his will as a private and sacred document, and on that account is presumed to keep it with the same degree of care and privacy as he does his most important papers and documents; and when it is shown by competent evidence that his will has been found in a place where he is in the habit of keeping papers and documents of importance and value, with the signature erased, or no will is found in such a place, as the case may be, there is a legal inference arising from such evidence, together with the presumptions mentioned, that in the one case he canceled the document himself, and in the other that the destruction was by his own hand. In the Clark Case the proof showed that the will was found in a drawer of testatrix's bureau in her bedroom by proponent, a legatee, with two lines drawn in ink across testatrix's signature, and with a line through proponent's name as legatee in body of the will. No person was shown to have been in the room where it was found, except the de-

cedent, the legatee, and her uncle, who were her witnesses. The surrogate said:

"Under these circumstances I must hold that the evidence which has been adduced by the proponent herself raises the presumption of cancellation and revocation by the decedent."

In the Philp Case it was proved that the will was found by the testator's wife, in his safe, which was locked, and the combination in her possession. Mr. Justice O'Brien, at general term, said:

"When the will was presented, it was with this infirmity of cancellation upon and a part of it. In the absence, therefore, of any evidence whatever from which the inference or presumption could be drawn of improper treatment of the will, the learned surrogate was justified in the conclusions which he drew from the conceded facts."

In Re Brookman, 11 Misc. Rep. 675, 33 N. Y. Supp. 575, the will was shown to have been found in testator's box in his safe among a lot of canceled and worthless papers, marked "Void." In Collyer v. Collyer, which was the case of a lost will, the proof showed that a most diligent search had been made for the will, that none was found, and that none had been seen by any one for six years prior to the testator's death. In the case of Hard v. Ashley—also a case of a lost will—the fact was shown that the last seen of the will was with the deceased, or under her control. In all these cases there was evidence or admissions that the will, in its mutilated condition, was in the personal keeping of the testator, or that after a search in the places where the testator would naturally keep a will none was found. I find no authority going to the extent of holding that where a will floats into the surrogate's office from an unknown source, or is found in the possession of strangers with the signature canceled or obliterated, without other evidence, that there is any presumption that the destruction or cancellation was by the hand of the testator. There must be some evidence, either direct or circumstantial, upon which the court can base a finding of fact one way or the other. Hitchings v. Wood, 2 Moore, P. C. 355, 447. In this case Lord Lyndhurst, writing the opinion, says:

"Then, as to the alleged cancellation, we think, if this be a genuine instrument, that the onus to make out the fact of the cancellation is on those who oppose the codicil. It seems that a corner had been burnt, the paper torn through, and in one place across the signature; but by whom, and under what circumstances, does not appear. There is nothing whatever to show that it was done by the testator, or, if so, with what intention it was done. If it be a genuine instrument, it proves that there was also another codicil, and which is not forthcoming. It is obvious, we think, that it must have been improperly dealt with, for, if it was defaced by the testator, he either would have entirely destroyed it, or it would have been found in this state among his papers. The circumstances of its being in other hands shows that a fraud had been practiced, and that no safe conclusion can be drawn from its appearance that it was burnt or torn by the testator. But, even if it had been found among the testator's papers at the time of his death, we incline to think some further evidence beyond its present appearance would be necessary to show that he intended to cancel it. Our opinion, therefore, is that the codicil ought to be approved."

This language of Lord Lyndhurst is quoted by Mr. Justice Peckham in Throckmorton v. Holt, in which latter case the paper purporting to be the will of Judge Holt came to the probate court

through the mail, from an unknown source, partly burned and torn, but not to the extent of making it illegible. Mr. Justice Peckham, in his opinion reversing the lower court, says:

"There must be some evidence of an act by deceased, or under his direction, which would be sufficient to show the fact; or the instrument must have been found among the private papers of the deceased, mutilated and torn, or otherwise defaced, and under such circumstances that the fact of revocation might be presumed."

The proof in this case shows that Mr. Hopkins was a careful, methodical business man. At the time of his death he was the secretary and general manager of the Tide Water Pipe Company, the office of which was at 12 Broadway, New York City, at which office he attended about twice a week. When there he occupied a roll-top desk of the company assigned to his use, but when he was absent the desk was occupied and used by others, being left unlocked, so that any one in the office could have access to it. He had a safe deposit box in the Produce Exchange Safe Deposit Company of New York City in the joint names of himself and wife, and he also had a safe deposit box at Tarrytown. He died on the 9th of May, and was buried on the 12th. On Monday, the 13th, his widow, the proponent, accompanied by her brother, Alexander Chambers, went to New York to the office of the Tide Water Pipe Company, and there met Mr. Warren, who was connected with the company, and who had held confidential relations with the deceased, and had occupied a desk in the same room with him. These three then went across the street to the Produce Exchange Safe Deposit Company's vaults, and made a careful search for a will, but none was found. They then returned to the office of the Tide Water Pipe Company, and a search was made by Mr. Warren and Mr. Chambers through the company's safes, in which Mr. Hopkins sometimes put papers for safe-keeping, and through the desk in the office which had been used by him in his lifetime. No will was found. Mrs. Hopkins and her brother returned to Tarrytown that day, and searched the safe deposit box at that place, but no will was found. On the next day (Tuesday) they returned to the office of the Tide Water Pipe Company, and the same persons again examined the box in the Produce Exchange Safe Deposit Company's vaults with like result. They then returned to the Tide Water Pipe Company's office, and searched again carefully through the desk, which was an ordinary roll-top desk with drawers on the right and left hand sides of the top portion, these drawers being about 15 inches long, 8 inches wide, and 2 inches deep. Every drawer was examined, and every paper taken out and examined, and every envelope was opened, but no will was found, and the search was given up about 1 o'clock. Mrs. Hopkins returned again to Tarrytown, and made another search in the box at the bank and in his private desk at home, with no better results. About three hours after Mrs. Hopkins and Mr. Chambers left the New York office, Mr. Warren went to the same desk to get a check book which belonged to a corporation in which both Mr. Hopkins and himself were interested. He opened the right-hand drawer under the roll top, and there found a blue envelope, on the outside

of which were the words "Robert E. H." in Maj. Hopkins' handwriting. Inside the envelope was the will. There were no other papers of any kind in this drawer, and the drawer was otherwise empty, with the exception of a few pens and an ink eraser. On examining the will, Mr. Warren found the signature of Maj. Hopkins to the will canceled as already described. He read the will, and called the attention of some of the parties in the office to the fact, and on the following morning turned it over to Mrs. Hopkins in the condition in which it was found. It appears that Mr. Hopkins was a man of about 68 years of age at the time of his death. At the time of the making of the will he was suffering from some tremulousness in his hands, clearly evident in his handwriting, and which increased as he grew older. We have the evidence of Mr. Carvalho, the noted handwriting expert, that in his opinion the marks canceling the signature were not made by the same hand that wrote the signature. It further appears that a year prior to his death he had been told by his physician that he had heart trouble, and must be very careful; that he was liable to pass away at any time by apoplexy; and that he should get his business in proper shape, and that, if he had not made a will, he should do so. Then we have the document itself, which apparently fulfills the testator's life sentiments. He remembers the institutions of his early education, the church which he first attended, the cemetery in which his father and mother were buried, the church at the place where his early struggles took place resulting in his fortune, the missions in which he was interested, and the friends and relatives who had attached themselves to him during life, and, above all, providing for his aged sister, who was dependent upon him, and for whom he had provided for many years. The evidence is that there had been no change in his feelings towards any of the objects of his bounty, but that the ties grew stronger as the years rolled on. The relationship which existed between this man and his wife were of the closest and most confidential character. Under all these circumstances, and under all the proofs which are before us, can we infer that he canceled his signature to the paper offered for probate with an intention to revoke the same? I think not. I think that the inference is overwhelming that the cancellation was not made by the testator himself, but by another hand. There is, however, no proof that it was made by another by his direction and consent, as the statute requires. Therefore the paper must be regarded as a valid testamentary disposition, and be admitted to probate.

Costs will be allowed to all parties, payable out of the fund, with an allowance to the special guardian to be paid out of the infant's share of the estate.

The special guardian has represented his ward with conspicuous zeal and fidelity, and his conscience might well be satisfied of a duty well performed with the entry of the decree of the surrogate's court. Nevertheless, the interest of the infant at stake is so large, and the facts so unusual, that I think his duty will not be complete until the law, as applied to the facts of this case, has been reviewed at least by the appellate division of the supreme court.

Probate decreed.