In the Matter of the Probate of the Will of ROBERT E. HOPKINS, Deceased.

ROBERT E. HOPKINS, JR., Appellant; FANNY W. HOPKINS et al., Respondents.

EVIDENCE — HANDWRITING — TESTIMONY OF AN EXPERT AS TO IDEN-TITY OF PERSON MAKING MARKS CANCELING SIGNATURE TO A WILL, INADMISSIBLE — MARKS NOT "WRITINGS" WITHIN MEANING OF STAT-UTES PERMITTING COMPARISON OF HANDWRITING BY EXPERTS. When the only question of fact presented for the determination of the court upon the probate of a will is whether the testator's signature thereto was canceled by him, with the intention of revoking his will, by fourteen nearly perpendicular marks drawn across the letters of his signature, the testimony of an expert in inks and handwriting, that, judging from the signatures of the testator appearing on the will, such marks were not made by the same person who wrote the signature to the will, is inadmis-sible, since such marks are not "writings" within the meaning of the statutes (L. 1820, ch. 36, amd. L. 1888, ch. 555) which permit the com-parison of writings by experts, and mere marks or scratches, used either perpendicularly or horizontally over a signature for the purpose of can-celing it, do not contain the characteristics necessary in the formation of letters to enable an expert, or any person, to speak with any degree of certainty with reference to the identity of the person who made the marks.

*Matter of Hopkins,* 73 App. Div. 559, reversed.

(Argued October 8, 1902; decided November 11, 1902.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered June 6, 1902, which affirmed a decree of the Westchester

County Surrogate's Court admitting to probate a paper writing propounded as the last will and testament of Robert E. Hopkins, deceased.

The facts, so far as material, are stated in the opinion.

*Joseph W. Middlebrook* for appellant. The testimony of the witness Carvalho should have been excluded, being altogether incompetent, and the witness himself being unqualified. (*Dougherty* v. *Milliken*, 163 N. Y. 527; *People* v. *Molineux*, 168 N. Y. 264; *Clason* v. *Bailey*, 14 Johns. 483; Taylor on Ev. § 1877; *Matter of Taylor*, 10 Abb. Pr. [N. S.] 300; *Taylor* v. *Crowinshield*, 5 N. Y. Leg. Obs. 224; *Sarvent* v· *Hesdra*, 5 Redf. 47; *Green* v. *Terwilliger*, 56 Fed. Rep. 384; *Winans* v. *N. Y. & E. R. R. Co.*, 21 How. [U. S.] 101; *Roberts* v. *N. Y. E. R. R. Co.*, 128 N. Y. 455.) The presumption was that the cancellation was done by Robert E. Hopkins, the testator, and it was necessary that that presumption be either repelled or rebutted. (*Dan* v. *Brown*, 4 Cow. 483; *Bigelow* v. *Gillott*, 123 Mass. 102; *Woodfill* v. *Patten*, 76 Ind. 575; *Estate of Tomlinson*, 133 Penn. St. 245; *Evans' Appeal*, 58 Penn. St. 238; *Townsend* v. *Howard*, 86 Me. 285; *Matter of Olmstead*, 122 Cal. 224; *Lambell* v. *Lambell*, 3 Hagg. Eccl. Rep. 568; *Bigge* v. *Bigge*, 3 Notes of Cases, 605; *Matter of Cooke*, 5 Notes of Cases, 390; *Avery* v. *Pixley*, 4 Mass. 460.) Every presumption was against the theory of cancellation by any person other than testator, and such theory could be maintained only by positive proof. (*Hard* v. *Ashley*, 88 Hun, 107; *Timon* v. *Claffy*, 45 Barb. 438; *Ricketts* v. *Mumford*, 2 Phil. 23; *Moore* v. *De Laterre*, 1 Phil. 375; *Shultz* v. *Hoagland*, 85 N. Y. 464; *Morris* v. *Talcott*, 96 N. Y. 100; *People ex rel.* v. *Barker*, 141 N. Y. 251; *Bernheimer* v. *Rindskopf*, 116 N. Y. 428; *O'Gara* v. *Eisenlohr*, 38 N. Y. 297; *McIntyre* v. *Buell*, 132 N. Y. 192.)

*Clarence S. Davison* for Fanny W. Hopkins, respondent. The testimony produced before the court overwhelmingly

outweighs the presumption that testator canceled his signature *animo revocandi*, and justifies the probate. (*Grier* v. *P. C. Co.*, 128 Penn. St. 98 ; *Matter of Clark*, 1 Tucker, 445 ; *Matter of Philp*, 46 N. Y. S. R. 356 ; *Matter of Brockman*, 67 N. Y. S. R. 297 ; *William* v. *Tyley*, 1 Johns. Ch. 530 ; *Townshend* v. *Howard*, 86 Me. 285 ; *Woodfill* v. *Patton*, 76 Ind. 575 ; *Matter of Olmstead*, 122 Cal. 224.) The expert testimony of the witness Carvalho was properly admitted. (*Lansing* v. *Russell*, 3 Barb. Ch. 325 ; *Kowing* v. *Manly*, 49 N. Y. 192 ; *Jackson* v. *Van Dusen*, 5 Johns. 144 ; *Jackson* v. *Jackson*, 39 N. Y. 159 ; *Comm.* v. *Webster*, 5 Cush. 301 ; *Comm.* v. *Nefus*, 135 Mass. 533 ; *Lyman* v. *Lyman*, 9 Conn. 55 ; *Gervais* v. *Baird*, 2 Brev. 37 ; *Paisley* v. *Snipes*, 2 Brev. 200 ; *Strong* v. *Brewer*, 17 Ala. 706.)

*James MacGregor Smith* for American Board of Commissioners for Foreign Missions et al., respondents. · There was no error committed in receiving the testimony of Mr. Carvalho, the handwriting expert. (*People* v. *Molineux*, 168 N. Y. 264 ; *Titford* v. *Knott*, 2 Johns. Cas. 210 ; *Jackson* v. *Van Dusen*, 5 Johns. 144 ; *Miles* v. *Loomis*, 75 N. Y. 288 ; *McKay* v. *Lasher*, 42 Hun, 270 ; *Dresler* v. *Hard*, 127 N. Y. 235 ; *Lansing* v. *Russell*, 3 Barb. Ch. 325.)

*Ernest I. Edgcomb* for Pompey Congregational Church et al., respondents. The marks in question do not of themselves constitute a revocation of the will. (*Jackson* v. *Holloway*, 7 Johns. 394 ; *Dan* v. *Brown*, 4 Cow. 483.) No error was committed in admitting the evidence of the witness Carvalho. (*Berkley* v. *Thomas*, Plowd. 118 ; Lawson on Expert Ev. [2d ed.] 350 ; *State* v. *Tice*, 3 Oreg. 457 ; *Strong* v. *Brewer*, 17 Ala. 706 ; *George* v. *Surrey*, M. & M. 516 ; *Lansing* v. *Russell*, 3 Barb. Ch. 325.)

HAIGHT, J. Robert E. Hopkins died at Tarrytown in this state on the 9th day of May, 1901. He was possessed of a large estate, and left him surviving Fanny W. Hopkins, his widow, and Robert E. Hopkins, Jr., his son, of the age of thir-

teen years, his only heirs at law and next of kin. He in company with other gentlemen organized the Tide Water Oil Co. and the Tide Water Pipe Co., and the greater portion of his time was occupied in attending to the business of those companies. His desk and office was in a room of the building in the city of New York in which the business of the companies was chiefly transacted. He had two safe deposit vaults, one in the city of New York and the other at Tarrytown, and it was his custom to keep his valuable papers in one of those vaults. After his death a search was made for his will. It was not found in either of the safe deposit vaults, but the paper now propounded as his will was finally found the second or third day after his funeral in a little drawer under his roller-top desk in his office. When found his signature was canceled by fourteen nearly perpendicular marks with pen and ink drawn across the letters of his signature. The paper is dated the 14th day of November, 1891, and undoubtedly it was executed as his last will and testament at that date. And the only question of fact presented for the determination of the court is as to whether his signature thereto was canceled by him with the intention of revoking the will.

The finding of the will in the testator's desk with his signature canceled raised the presumption that the cancellation was done by him with the intention of revoking it. Williams on Executors (Vol. I, page 85) says : "If a testament was in the custody of the testator, and upon his death it is found among his repositories canceled or defaced, the testator himself is to be presumed to have done the act; and the law presumed that he did it *animo revocandi*." In Redfield on Wills (p. 307) it is said: "The rule of evidence in the ecclesiastical courts, in regard to the presumptive revocations, from the absence or mutilation of the will, seems to be, that if the will is traced into the testator's possession or custody, and is there found mutilated in any of the modes pointed out in the statute for revocation, or is not found at all, it will be presumed the testator destroyed or mutilated it, *animo*

*revocandi ;* but if it was last in the custody of another, it is incumbent upon the party asserting revocation, to show the will again in the testator's custody, or that it was destroyed or mutilated by his direction." (See, also, 1 Jarman on Wills, page 119, to the same effect.)

Upon the trial the presumption that the will was revoked by the testator was sought to be overcome by showing that a previous search of the desk was made for the purpose of discovering the will, and that it was not then found ; from which the claim is made that the will must have been in the possession of some other person than the testator and that it was subsequently placed in the desk with the signature canceled. It appears that two searches of the desk were made. The first by opening the drawers and looking in, but not by carefully taking out the papers and examining them. The next day a more careful search was made, after looking through the deposit vaults. At this time the papers were taken out and examined, but the will was not found. This examination was made by Mr. Warren, who occupied a desk in the same room with the decedent, and who had been connected with him in business for twenty-five years. It was made in the presence of the widow and her brother and was concluded between one and two o'clock in the afternoon. About four o'clock the same afternoon Mr. Warren went again to the desk to do some writing, and, he says, mechanically he put his hand on the little drawer and on pulling it open saw the blue envelope, which he took out and found to contain the will. The drawer appears to have been in little use for it contained only a few pens and an ink eraser besides the envelope containing the will. It was not shown that any person had possession of the instrument or had any motive to cancel it other than the son, who became chiefly benefited by its cancellation. It is not pretended that it was done by him, as he was only thirteen years of age, and he was not shown to have been at the office of his father after his death and before the instrument was found. It is, therefore, claimed upon the part of the guardian *ad litem* that the will was overlooked during the previous

examinations of the desk, and that the presumption in law that the will was canceled by the testator was not overcome by the evidence.

This brings us to the consideration of the other evidence given on behalf of the proponent to establish that the cancellation was not done by the testator. This evidence was given by the witness Carvalho, an expert in inks and handwriting. He was asked the following questions: "In your opinion, as an expert, were those perpendicular marks made by the same person as wrote the signature on that will?" This was objected to by the guardian *ad litem*, and the objection was overruled and an exception taken. He answered, "Judging from the material at hand, the signature of the will, I say, not." Q. "Judging from the signature R. E. Hopkins, as appears on the first page, and the signature Robt. E. Hopkins, as it is signed opposite the seal on the instrument, have you an opinion as to whether the marks, the fourteen marks, are written by the same hand?" To this the guardian *ad litem* also objected, and the same was overruled and exception taken. He answered, "I have an opinion." He was then asked, "What is that opinion?" Same objection, ruling and exception. He answered, "That they were not."

The will was drawn by a lawyer and was not in the handwriting of the testator. The signature appears upon the instrument at the end thereof, opposite the seal, and in the margin under the words "to the effect that an erasure was made before signing it." These signatures were written in a plain bold hand ten years before the testator's death and were the only writings which the expert had before him with which to compare the cancellation marks. Were these marks "writings" within the meaning of chapter 36 of the Laws of 1880 and chapter 555 of the Laws of 1888, which permit the comparison of writings by experts? The Appellate Division appears to have been of the opinion that they were. But we do not understand that such was the purpose or intent of these statutes. These enactments were considered by this court in the case of *People* v. *Molineux* (168 N. Y. 264), in which

the purpose of these statutes was pointed out. Prior to their enactment, comparison was permitted only with writings in evidence which were material upon some of the issues of the case. The expert was, therefore, limited in his investigation to an examination, in many instances, to but one or two specimens. The purpose of these statutes was to give him a broader field for his investigation by permitting other writings, which were not material upon the issues of the case, to be introduced in evidence solely for the purpose of comparison. The statutes do not purport nor were they intended to change the meaning of the word " writing " as it had theretofore been used and understood, or to authorize comparison with anything that was not previously regarded to be the subject of comparison.

The chief case relied upon in support of the admissibility of the testimony of the expert is that of *Lansing* v. *Russell* (3 Barb. Ch. Rep. 325). In that case the action was brought to set aside two conveyances of real estate executed by C. Lansing shortly before his death, he then being ninety years of age. The deeds were executed by his making his cross opposite the seal. The crosses were proved by a witness who saw the deeds executed. To rebut this the complainant produced upon the trial several witnesses, who were cashiers of banks and experts in detecting forgeries and counterfeits, to testify that in their opinion the marks made to these deeds were not the marks of a person of the age of Mr. Lansing. The chancellor said with reference thereto, " I think the testimony of the experts, who had been in the habit of examining signatures and marks of young persons as well as of aged ones to prove that the marks to these deeds could not have been genuine marks of the unaided hand of old age and decrepitude, was properly received, upon the trial, as legal evidence to establish that fact." The testimony of these experts, however, was rendered unimportant for the reason that the witness, who testified to the execution of the deed stated that Mr. Lansing, in making his mark, asked his son who was standing by to steady his hand, and thereupon his

son took hold of his hand and assisted him in making the mark. It is true that this case is cited in the case of *Kowing* v. *Manly* (49 N. Y. 192–203), as is also that of *Moody* v. *Rowell* (17 Pick. 490), but not with approval, as is claimed, but for the purpose of showing that the question then under consideration was not controlled by those cases.

It is apparent that the case of *Lansing* v. *Russell* does not cover the question now presented. It is quite possible that an expert can determine whether a cross was made by a person in the prime of life with a steady hand, or by a person of advanced age with a feeble, trembling or shaking hand. Such testimony is not based upon the comparison of writings but is based upon the condition of the individual, and, therefore, the case is not decisive of that which we now have under review.

An expert may doubtless be able to determine whether one mark is made over another, whether a mark is made by a trembling or steady hand, and, if familiar with inks, he may also be able to determine nearly the age or the time that the writing was made. It has also been held that the mark of an individual to an instrument may be proved by those who have seen him make his mark to other instruments where the mark contains some peculiarity which they have noticed and observed, thus enabling them to distinguish it from other marks. (*Strong* v. *Brewer*, 17 Ala. 706; *Paisley* v. *Snipes*, 2 Brev. [S. C.] 200; *George* v. *Surrey*, 1 Moody & Malkin [Eng.] 516.) But this class of evidence is dependent upon the familiarity of the witnesses with the peculiarities of the persons making the cross, and is not the subject of the opinion of experts whose only knowledge or familiarity of writings is obtained by comparison.

In the case of *Jackson* v. *Van Dusen* (5 Johns. Rep. 144–155), VAN NESS, J.; in delivering the opinion of the court, says: "The testator having made his mark, no evidence of course could be given or expected to prove his handwriting." In that case, one of the witnesses to the will, Samuel Wheeler, signed the same by making his initials, "S. W." The signing

of the will as a witness by Wheeler was proved by one Van Dyck, who had seen him sign the initial letters of his name and described the peculiarities of the characters as made by him. In this way he identified the letters as having been made by Wheeler. This, the judge said, was not the proof of Wheeler's signature by comparison of hands. In *Jackson* v. *Jackson* (39 N. Y. 153–160), WOODWORTH, J., says, "That when it is necessary to prove an execution of an instrument by a 'marksman,' the proof is evidence of the making of the mark. The writing of the name around it is no essential part of the evidence." In the case of *Shinkle* v. *Crock* (17 Penn. St. 159), the will of Susan Crock was executed by making her mark. A witness who was not present at the execution of the will was permitted to testify to his belief that the mark was genuine. His belief was founded upon his acquaintance with the mark, claiming that it had certain peculiarities which distinguished it from others. The judgment was reversed upon this ground. LEWIS, J., who delivered the opinion of the court, says : " We have gone far enough in receiving the bare belief of a witness, founded upon a comparison of writing in dispute, with some specimen of which he may have but a faint recollection. Where a mark, on inspection, appears to have nothing in its construction to distinguish it from the ordinary marks used by illiterate persons to authenticate their contracts, it is not the subject of this description of evidence."

In the case of *Gilliam* v. *Parkinson* (4 Rand. [Va.] 325), CARR, J., says: " In the case now before us, the attesting witness has made his mark. Now I ask, how could this be proved ? There is a distinct individual character in the writing of every man who can write ; and with those who have written much, that character is so fixed and striking that persons acquainted with it will find no more difficulty in recognizing it than in knowing the face of the writer. Where the name of a witness is written by himself, therefore, it may generally be proved with something like certainty. But here, there is no writing. The name of the witness is written by another, and he makes

a cross mark; perhaps, the first and last he made in his life. To attempt to prove such a signature as this would be a mockery of justice."

In the case of *Jones* v. *Hough* (77 Ala. 437) the remarks of the judge in *Gilliam* v. *Parkinson* are quoted with approval, as is also the case of *Watts* v. *Kilburn* (7 Ga. 356), in which it is said that "where the name of a person is written by another and he makes a cross mark, there is nothing distinctive to fix its identity." In *Travers* v. *Snyder* (38 Ill. App. 382) the question was whether there can be a comparison between cross marks or a mere mark and another. With reference thereto the court said : "How can simply a mark be recognized as that of any particular person without any proof of any particular characteristic by which it can be distinguished ? It seems to us that it would be very unsafe, and lead to dangerous results to allow such comparison to be made and taken as evidence, unless, at least, some proof was made that the mark had some established characteristics like a handwriting that would enable it to be recognized. A mere cross or mark cannot be identified, and it, therefore, stands for itself alone."

In the early period of the English law expert testimony was unknown, but, as the world advanced in education, the courts commenced to avail themselves of the knowledge of others pertaining to scientific matters which was not possessed by ordinary individuals. From this beginning expert testimony has continued to grow in importance and in use until the present time. It, however, has met with much criticism on the part of the courts, and it has been denounced as misleading and unsatisfactory in numerous cases. It is, however, useful in a variety of cases and within reasonable bounds should be encouraged. But we have now reached a case where it is sought to establish that mere marks made over the signature were not made by the person who wrote the signature, by the opinion of an expert. This is carrying the use of the opinions of experts beyond any reported case to which our attention has been called, and we now think

24

that the time has come in which a limitation should be placed upon this class of evidence.

The general rule which admits of the proof of the handwriting of a party by experts, who have compared the writing with other writings of the person, is founded on the reason that in every person's writings there is a peculiar prevailing characteristic which distinguishes it from the handwritings of every other person, and, therefore, an expert, by studying characteristics as they appear in the writings of the person, may be able to determine with some degree of certainty as to whether a writing sought to be proved contains any of the characteristics of that of which he has examined and studied. But mere perpendicular marks, or scratches, used either perpendicularly or horizontally over a signature for the purpose of canceling it, do not contain the characteristics necessary in the formation of letters to enable an expert, or any person, to speak with any degree of certainty with reference to the identity of the person who made the marks.

In the case before us it is quite probable that the signature was canceled by the perpendicular marks ten years or thereabouts after the signature was written. The expert concedes this in giving the age of the ink marks over the signature, and yet, looking at the letters forming the signature made ten years before, he was allowed to give his opinion to the effect that the marks were not made by the same person who wrote the signature. This, we think, is carrying the privileges of an expert too far, and that the testimony is too dangerous and uncertain to be received as evidence and considered by either the court or jury.

The judgment of the Appellate Division and the decree of the Surrogate's Court should be reversed, and the proceedings remitted to Westchester county for a trial before a jury in the Supreme Court to determine whether the will in question was revoked by the testator, costs in all of the courts to abide the final award of costs.

PARKER, Ch. J., O'BRIEN, BARTLETT, VANN, CULLEN and WERNER, JJ., concur.

Judgment reversed, etc.