(109 App. Div. 861)

### In re HOPKINS' WILL.

(Supreme Court, Appellate Division, Second Department.   December 29, 1905.)

WILLS—CONTEST—SUFFICIENCY OF EVIDENCE OF REVOCATION.

> On the issue as to whether a will was revoked by the testator by drawing lines across his signature, evidence *held* sufficient to support a finding that it had not been revoked.

Woodward, J., dissenting.

Appeal from Trial Term.

Proceedings by Joseph W. Middlebrook, special guardian of Robert E. Hopkins, Jr., to contest will of Robert E. Hopkins, deceased.   From an order denying contestant's motion to set aside a verdict directed by the court, and for a new trial, he appeals.   Affirmed.

See 87 N. Y. Supp. 793.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, RICH, and MILLER, JJ.

Joseph W. Middlebrook, for appellant.

Charles Blandy (Andrew J. Shipman and Clarence S. Davison, on the brief), for respondent Fanny W. Hopkins.

James MacGregor Smith, for respondents American Board of Commissioners for Foreign Missions, and Congregational Home Missionary Society.

Ernest I. Edgcomb, for respondents Pompey Congregational Church, Pompey Academy, and Pompey Cemetery.

HIRSCHBERG, P. J.   The question of fact which the Court of Appeals directed a jury should determine in this case is whether the will of the deceased was revoked by him.   See Matter of Hopkins' Will, 172 N. Y. 360, 370, 65 N. E. 173, 65 L. R. A. 95, 92 Am. St. Rep. 746.   That question has been tried before a jury and submitted by the counsel to the trial court, by which it has been determined that the deceased did not revoke the will.   That determination cannot be reversed on this appeal as against the evidence or the weight of evidence, since it is in exact accord with all the evidence given on the trial, and it can only be disturbed on the theory that the witnesses were all honestly mistaken, and that each of them overlooked the will when it was in plain sight during all the hours they were searching for it.   The deceased died on May 9, 1901, and the will was found in the desk used by him in his lifetime at about half-past 4 in the afternoon of May 14, 1901.   That it was not in the desk during the earlier part of that day or on the day before is established by uncontradicted evidence as clear and convincing as evidence can ever be, and it is equally undisputed that, when found, it was not in the condition that it was in at the time of its execution; some one having since attempted to cancel the signature of the testator by drawing 14 pen marks through it.   Manifestly the question whether this cancellation was the act of the testator or of another rests presumptively upon whether the will was in his desk at the time of his decease.   If it was not, but was afterwards placed there surreptitiously by some one who has not been willing to come forward and explain the circumstance, notwithstanding the publicity of the

litigation which has ever since been going on, the inference is resistless that the alien custody of the document was not innocent, and that the attempted destruction of the testator's signature was done with a sinister motive.

The testator lived at Tarrytown; but his business office was at No. 12 Broadway in the borough of Manhattan. His desk was there, was never locked, was kept open all day, and was in common use by others when he was away. No drawer of the desk was ever locked. The desk was accessible to scores of people. The deceased was a man of considerable means, but he never kept anything of value in this desk, and the little drawer in which the mutilated will was ultimately found was reserved for refuse. Nothing of value was found in the desk after his decease. He had boxes in two bank vaults; and, when it was learned by actual search that his will was not in either of these boxes, a systematic search of the desk referred to was made by his widow, her brother, Mr. Chambers, and Mr. Warren, a business associate of the deceased, on the mornings of May 13th and May 14th. The little drawer in question was flush with the recess into which it was fitted, on the top, as well as on the sides and back, and it was placed in evidence as "Proponent's Exhibit No. 3." In this little drawer Mr. Warren found the will after the drawer had been carefully searched for it on two occasions without avail. The search made each day is minutely described by each of the parties to it. Mr. Warren testified as to the search made on May 13th:

"We went through the desk pretty thoroughly, but not removing all the papers, nor taking the papers out of the drawers, but examining, so far as we thought, everything that was in there. Q. Did you find the will? A. I did not. Q. Did you examine this same drawer on that occasion? A. We did. Q. Was that envelope and that will in that drawer on that occasion? A. I think not. Q. Was it in any other part of the desk? A. I think not. Q. (By the Court). You did not remove all the papers on the first search? A. On the first search we did not take out the papers thoroughly. We looked through them and looked at the various things and put them back in their places, but didn't disturb the relative positions of the papers. When we got through with the papers, they were in pretty near the same position as when we started. Q. But on the second occasion, on the 14th, everything was taken out? A. Everything was taken out of the drawers and out of the pigeonholes."

Referring specifically to the search made on May 14th, he said:

"We went through the desk there carefully, taking out every paper from the pigeonholes, from the drawers and from the table of the desk, opening them sufficiently to examine their contents, separated them into four different piles, one of which consisted of Mr. Hopkins' personal papers, letters, and so on—letters received by him—which I handed to Mrs. Hopkins, and which she took away with her. The second pile consisted of memoranda and reports pertaining to the Tide Water Pipe Company and the Tide Water Oil Company. They made a second pile. There was another pile made of papers appertaining to a gold mining company in which Mr. Hopkins was interested. They made a third pile. The fourth section were destroyed as being useless. * * * Q. State what you did as to this drawer, Exhibit 3, if anything? A. We opened that drawer and every other drawer in the desk, took the papers which we found out from the drawers, and put them into one of these four piles that I speak of, leaving the drawers empty. Q. When you examined this drawer, Exhibit 3, on the occasion of that search, in the morning, was this envelope and this will in the drawer? A. The paper was not

in the drawer.  *  *  *  Q. Do you recall whether upon the 13th you looked
in this drawer, Exhibit 3? A. I am very positive that I did.  I looked in
every drawer.  *  *  *  Q. Do you have any positive recollection of opening
this drawer on that occasion, the 14th of May? A. I think I have.  Q. Did
you open it at the first part of the search or the latter part? A. I would
naturally open it the first thing I did.  Q. Well, no.  You say you would
naturally open it? A. Yes.  Q. You have no recollection, except from argu-
ment, then.  Is that it? A. I think I did.  I think that was the first drawer
that I opened.  *  *  *  Q. Can you say in regard to that about whether
there was anything in that drawer at that time or not? A. Yes; I can say that
there was nothing in the drawer, or I would have seen it.  I am very posi-
tive that I opened the drawer; but as to when, or just how far, I cannot say.
Q. Understand, Mr. Warren, I don't wish to criticise it at all; but we just
want the fact, instead of the argumentative statement that you would have
seen it if it was there.  That is argumentative; but did you or did you not
see it? A. I am very positive that I opened that drawer and that I did not
see any paper in there."

Mr. Chambers testified as to the search on May 13th as follows:

"We then turned to Mr Hopkins' desk and made an examination of that.
By examination of the desk I mean that we examined all papers and looked
carefully for the will, but replaced the papers, as we would take them out
of one place, examine them, and put them back again.  Q. Put them back
in the same place? A. In the same place.  The desk was left substantially
as we found it.  We went through the entire desk, but did not find the will."

Referring to the second day's search, he said:

"We commenced a systematic search, commencing at the right-hand side—
commencing at the top, the pigeonholes.  I took the papers out.  *  *  *  We
went straight through the upper part of the desk in that order.  We took out
every paper there was in that upper part of the desk, left nothing in the
shape of a paper that we did not look at or move.  *  *  *  Then we com-
menced at the drawers.  We started down one side, pulled the drawers out,
took everything out of them.  *  *  *  The drawers of the desk were ex-
amined by opening them, taking the papers out, and replacing the drawers.
Q. Did you take out this little drawer which is marked 'Exhibit 3?' A. Yes,
sir.  Q. Did you find in the drawer this blue envelope with the will inside?
A. No, sir.  Q. Was it there? A. No, sir."

Mrs. Hopkins testified to the same effect as Mr. Warren and Mr.
Chambers.  She was asked, and answered as follows:

"Everything was taken out of the desk, and I looked in those drawers just
as much as Mr. Warren and Mr. Chambers did.  In fact, I opened all the top
drawers myself; each of these little drawers that were right in front of me.
Q. Well, when you opened these little drawers, particularly when you opened
this little drawer which we have marked 'Exhibit 3.' the right-hand side
drawer, was this blue envelope with the will in that drawer? A. No, sir."

I have quoted from the evidence extensively in order to point the
fact that each of the three witnesses testified positively as the result
of independent examination that the will was not in the drawer, "Ex-
hibit 3," on the morning of either May 13th or May 14th.  There is a
great deal of evidence of searches had in other places where the will
might have been, to which evidence no detailed reference need be made;
the searches being significant only as demonstrating the thorough na-
ture of the quest and the extreme desire of the parties to find the will.
On the two days' search of the desk they were looking for something
which they wished to find.  The will, as subsequently found, was in
a large blue envelope indorsed in the handwriting of the deceased.  It
was a conspicuous object, and if in the little drawer was the only docu-

ment there; and it seems incredible that it could have been overlooked by so many people in the course of the systematic, united, and repeated searches, made under the stimulus of a sincere wish to find it. While it may be barely possible that all the parties overlooked it every time, yet, accepting the evidence as true and honest, its effect is to establish the fact that the will was not in the desk as fully as any fact can be established by human testimony. Once this fact is admitted, viz., that the will was not in the little drawer during the searches, the conclusion is certainly legitimate, if not imperative, that some one who had possession of it saw fit to place it unobserved in the little drawer on the afternoon of May 14th with the signature mutilated as stated, and to conceal the fact of its custody and its furtive deposit in the drawer ever since. The result has been protracted litigation and incidental comment in the press; but no one has appeared to explain that possession of the will was with the consent of the testator in his lifetime, and that, when the document was placed in the desk, it was in the condition with respect of the signature in which it was legitimately received by the individual who placed it there on the afternoon of May 14th. The rule of law applicable to the situation as expressed in the textbooks is quoted by Judge Haight in the opinion in 172 N. Y., at page 363, 65 N. E., at page 173 (65 L. R. A. 95, 92 Am. St. Rep. 746), as follows:

"Williams on Executors (vol. 1, p. 85) says: 'If a testament was in the custody of a testator, and upon his death it is found among his repositories canceled or defaced, the testator himself is to be presumed to have done the act; and the law presumed that he did it animo revocandi.' In Redfield on Wills, p. 307, it is said: 'The rule of evidence in the ecclesiastical courts, in regard to the presumptive revocations from the absence or mutilation of the will, seems to be that if the will is traced into the testator's possession or custody, and is there found mutilated in any of the modes pointed out in the statute for revocation, or is not found at all, it will be presumed the testator destroyed or mutilated it, animo revocandi; but, if it was last in the custody of another, it is incumbent upon the party asserting revocation to show the will again in the testator's custody, or that it was destroyed or mutilated by his direction.'"

There is no evidence of how the will came to be in the possession of whoever placed it in the little drawer after the unavailing searches were made. There is no proof of his identity or his motive. The motive may have been a desire to benefit the testator's child or hostility to the mother, or it may have been sheer malice and wantonness. The circumstances preclude a solution of the mystery. It would be more satisfactory, of course, were it otherwise, but in forensic contests where for any reason absolute certainty is unattainable reasonable certainty should suffice. But if full faith be given to the evidence, and the absence of the will at the time of the searches be accepted as a fact, it is easier to believe that the destruction of the signature was the work of a mischief maker than it is to credit it to the testator. Mr. Hopkins was a very methodical man, and it is unlikely that he would cancel his will by means of pen and ink strokes through his signature without some accompanying indication in his own hand that the deed was his own act. There are other formal modes of revocation which would naturally appeal to a methodical business man having a large estate dependent upon the accuracy of his testamentary expressions. On the

other hand, a stranger could have adopted no likelier means to work effective mischief than the crude method which has been adopted in this instance. To destroy the will altogether might have resulted in its proof as a lost will, and even by the production of a copy the fact of the existence of which might well be beyond the ken of the perpetrator. In balancing the probabilities, it cannot be denied that the likelihood of unlawful spoliation is at least as great as that of a legitimate revocation.

The litigation over this will has been protracted, vexatious, and expensive. The disposition of the property of the deceased which the will provides for is not unjust or unequal, and an end of the litigation will doubtless be of material benefit to both parties. The deceased left his widow and one child, a son now in his eighteenth year, and the will gives the widow something more than she would take in case of intestacy. Every court having jurisdiction to determine the disputed question of fact has found in favor of the integrity of the will. The surrogate so found originally. See Matter of Hopkins' Will, 35 Misc. Rep. 702, 72 N. Y. Supp. 415. This court affirmed his conclusion. See Matter of Hopkins' Will, 73 App. Div. 559, 77 N. Y. Supp. 178. When the Court of Appeals sent the question to a jury, it was again resolved in favor of the validity of the will, and the determination was reversed only for an error in ruling relating to the assignment of the affirmative of the issue. See Matter of Hopkins' Will, 97 App. Div. 126, 89 N. Y. Supp. 561. The present determination is to be regarded as the verdict of a second jury. The question must finally be determined by a jury, however often the verdict may be reversed; and it cannot be that sensible, practical men will ever render a verdict in this case in favor of intestacy. On the contrary, a jury will always be inclined to find in favor of the validity of the will, not only as in accord with all the evidence, but also because such a finding would dispose of the testator's estate in accordance with provisions which it is known did receive his solemn and formal sanction at one time, and which might have been retracted in unmistakable form had he so desired; while a contrary finding might, and probably would, consummate and legalize the malicious purposes of an unknown criminal.

I advise that the verdict be respected, and that the order refusing to set it aside be affirmed. All concur, except WOODWARD, J., who dissents.

WOODWARD, J. (dissenting). The questions involved in this case have been elaborately discussed by the learned surrogate who admitted the will of the late Robert E. Hopkins to probate (Matter of Hopkins' Will, 35 Misc. Rep. 702, 72 N. Y. Supp. 415), by the learned presiding justice of this department and in a dissenting opinion (73 App. Div. 559, 77 N. Y. Supp. 178), and by the Court of Appeals (172 N. Y. 360, 65 N. E. 173, 65 L. R. A. 95, 92 Am. St. Rep. 746), and very little is left open for consideration in this appeal from an order of the Trial Term denying the contestant appellant's motion to set aside the verdict directed by the court and for a new trial. Originally the will was admitted to probate. This court, with two justices dissenting, affirmed

the decree of the surrogate, and the Court of Appeals unanimously reversed this court, and directed that the issue whether the will was revoked by the testator be tried before a jury. The case was once tried before a jury, resulting in a verdict sustaining the will; but the judgment was reversed on grounds in no wise affecting the merits of the case (97 App. Div. 126, 89 N. Y. Supp. 561); and, having been tried a second time, and on motion of counsel for both parties to direct a verdict, the court directed a verdict sustaining the will, and from an order denying a motion to set aside this verdict and to grant a new trial an appeal comes to this court.

The salient facts in the case, as stated by Haight, J., in writing the opinion of the court on the former appeal (172 N. Y. 360, 65 N. E. 173, 65 L. R. A. 95, 92 Am. St. Rep. 746), are as follows:

"Robert E. Hopkins died at Tarrytown in this state on the 9th day of May, 1901. He was possessed of a large estate, and left him surviving Fanny W. Hopkins, his widow, and Robert E. Hopkins, Jr., his son, of the age of 13 years, his only heirs at law and next of kin. He, in company with other gentlemen, organized the Tide Water Oil Company and the Tide Water Pipe Company, and the greater portion of his time was occupied in attending to the business of those companies. His desk and office were in a room of the building in the city of New York in which the business of the companies was chiefly transacted. He had two safe deposit vaults, one in the city of New York and the other at Tarrytown, and it was his custom to keep his valuable papers in one of those vaults. After his death a search was made for his will. It was not found in either of the safe deposit vaults, but the paper now propounded as his will was finally found the second or third day after his funeral in a little drawer under his roller-top desk in his office. When found, his signature was canceled by 14 nearly perpendicular marks with pen and ink drawn across the letters of his signature. The paper is dated the 14th day of November, 1891, and undoubtedly it was executed as his last will and testament at that date. And the only question of fact presented for the determination of the court is as to whether his signature thereto was canceled by him with the intention of revoking the will."

Commenting upon this state of facts, the learned court say:

"The finding of the will in the testator's desk with his signature canceled raised the presumption that the cancellation was done by him with the intention of revoking it." (Citing authorities.)

The question presented upon this appeal is whether the evidence offered by the proponent in support of the will was sufficient to overcome this presumption, for it cannot be doubted that the will, if at all times in the legal possession or custody of the testator, must stand or fall by its condition when found. Matter of Hopkins' Will, 172 N. Y. 363, 65 N. E. 173, 65 L. R. A. 95, 92 Am. St. Rep. 746, and authorities there cited. Both parties asked for a direction of a verdict at the close of the trial, neither of them making any subsequent request to go to the jury upon any question of fact, and upon this appeal the verdict directed by the court must have the same force and effect as would be the case had the jury actually deliberated upon the issues. What, then, are the facts which were presented to the court to overcome the presumption of cancellation?

Mr. Hopkins, the testator, was born in Pompey, N. Y., March 23, 1833, and was a successful business man. He went to Titusville, Pa., in the course of his business experiences, and in 1878, joined with a Mr. Benson and a Mr. McKelvey in the formation of the Tide Water Pipe

Company, and 10 years later these same gentlemen organized the Tide Water Oil Company; Mr. Hopkins being chosen secretary and treasurer of both companies. He subsequently resigned the treasureship, but retained the office of secretary down to the time of his death, having a desk in the office of the companies at 12 Broadway, New York City. Mr. Benson died some years ago, and Mr. McKelvey became a paralytic and had not spoken for a period of 8 or 10 years, so that Mr. Hopkins became the sole active survivor of the original company. Mr. Hopkins married the proponent (then Fanny W. Chambers) at Titusville on the 17th day of February, 1886, and their only child, Robert E. Hopkins, Jr., in whose behalf the special guardian is contesting the probate of this will, was born on March 25, 1888. Two years later the family removed to Tarrytown, where, after the death of Mr. Hopkins, the widow and her son continued to reside.

The will in question was executed on the 14th day of November, 1891, at Tarrytown, and was drawn by Mr. McKelvey, being executed in his presence. Mr. McKelvey acted as the attorney of Mr. Hopkins in the matter, and after the execution of the will took it away with him, but there is no reason to suppose, and it is not suggested, that this possession of Mr. McKelvey, the attorney and intimate business associate of Mr. Hopkins, was not the possession in law of the testator. The absolute integrity of Mr. McKelvey is nowhere questioned, and all parties seem to rely upon this much in common. There is absolutely no evidence in the case to show that any person other than the testator and Mr. McKelvey ever saw this will from the day of its execution in Tarrytown until it was found, where the proponent and her brother had searched for it, among other places, in the testator's desk in the office of the Tide Water Companies on the 14th day of May, 1901, 10 years after its execution, and 5 days after the death of the testator. Clearly this will is brought within the rule that where the will is traced into the testator's possession or custody, and is there found mutilated in any of the modes pointed out in the statute for revocation, or is not found at all, it will be presumed the testator destroyed or mutilated it, animo revocandi; but, if it was last in the custody of another, it is incumbent upon the party asserting revocation to show the will again in the testator's custody, or that it was destroyed or mutilated by his direction. Matter of Hopkins' Will, 172 N. Y. 363–364, 65 N. E. 173, 65 L. R. A. 95, 92 Am. St. Rep. 746, and authorities there cited.

There is nothing in the case to indicate that this will was ever in the custody or possession of any other than the testator or his attorney, except that it is in evidence that the proponent, with the aid of her brother and one Warren, who occupied a desk in the same room with the testator during his lifetime, and who continued in the office subsequent to his death, searched this desk on two separate days, the last time on the 14th day of May, 1901, without finding the will, and that some two or three hours later Mr. Warren, in going to the desk for the purpose of writing a check, opened a drawer and found the envelope containing the will, which it is conceded was canceled in the manner heretofore pointed out at the time it was thus found. It is true that the evidence points out a somewhat thorough search of the desk, but it is such an

easy matter for three persons engaged in the work to assume that some of the others have opened a particular drawer, or to overlook its existence entirely, that it can hardly be considered conclusive evidence that the will was not in this drawer at the time that the proponent and the others were making the search. In fact, if Mr. Warren had been quite sure that this drawer had been examined, why did he open it on the occasion of his later visit to the desk. He does not give any reason for opening the drawer. It does not appear to have been at all necessary for any purpose that he was there for at that time, and the only reason which suggests itself why he should have opened this particular drawer at this particular time, was that he did not feel certain that the search had covered this particular place. When the will was found, the only other articles in the drawer were some pens and an eraser, and it hardly seems probable that any one placing the will in there would have taken the pains to place these trifling articles in with it, and yet there is no suggestion in the evidence that the searchers found this drawer empty or with these articles alone in it, a situation which must have excited comment if it had existed in a desk which had long been in use, and which appears to have been well filled with papers, memoranda, etc. It seems to me entirely clear that the probabilities are so strongly in favor of this drawer having been overlooked that it may be said that there was practically no evidence that the will had ever been out of the legal possession or custody of the testator.

To reach any other conclusion we must believe that some person, and who that person might have been is not suggested, unlawfully, and without apparent motive, canceled the signature upon this will, when he might, with far greater safety to himself and certainty of accomplishing his object, have placed the same in his pocket and destroyed it utterly. The testator himself might have desired the will as a memorandum. It could serve no useful purpose to one who was interested in causing its revocation, and the time and danger of discovery in making the marks are so out of proportion to that involved in the destruction of the will, if it was, in fact, out of the custody or possession of the testator, that it is doing violence to the law of probabilities to assume that these marks were made by any other than the testator, or that the will was, in fact, at any place other than in that drawer in his desk at the very time that these searches were being made. To reach any other conclusion we must assume that some one, animated by no other desire than to wantonly thwart the will of the testator, deliberately committed a crime, taking all of the chances of being detected in placing the will in this drawer after the search had been made, when he could have accomplished his purpose with absolute certainty and in comparative safety by consigning the same to the fire, or by throwing it into the sewer. It is possible, of course, that this might have been done, but it is not probable; while, if we regard the testator, who appears to have had possession or custody of the will during all of the time that elapsed between its execution and the time of finding the same, as having made the canceling strokes, an entirely rational course of action is manifest.

This view is supported by the fact that one of the legatees mentioned in the will had died, some of the specific legacies were not in exist-

ence, the testator had made personal gifts to some of the legatees since the will was made, and his son had grown to the verge of manhood. With these changed conditions, with the laws of descent and distribution making ample provision for his wife, for his estate was large, is there anything in the fact that he made a will in 1891 inconsistent with the idea that he might desire to cancel it in 1901? It seems to me entirely clear that the evidence in this case does not meet the issue. It shows the will in the custody or possession of the testator. It does not show that it was ever out of his custody or control, and the will as presented for probate is canceled by one of the methods pointed out by the statute. Under such circumstances the presumption of revocation by the testator is in full force, and the verdict of the jury, not having the support of evidence, should be reversed.

The order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the result of the final trial.