In the Matter of the Will of JOSEPH SCHOENGOLD, Deceased.

Surrogate's Court, Queens County, August 16, 1943.

*Nathan A. Goldenthal* for Mabel Schoengold, petitioner.

*Harry Schorr* for Lillian Bier, objectant.

SAVARESE, S. On August 31, 1942, Joseph Schoengold, accompanied by a friend, went to his lawyer's office in the borough of Manhattan and then and there executed his will, previously prepared for him, in the presence of his lawyer and two other witnesses. After execution the lawyer delivered the will in good condition to the testator who took the same and his wife's unsigned will away with him. There is evidence that upon his return home testator handed both instruments to his wife who put them in her pocketbook. His will when presented for probate by his widow, who is the sole executrix, legatee and devisee named therein, was torn in six pieces. Two pieces have not been produced. The testator died October 25, 1942, survived by his widow and three adult children. A son and a daughter have consented to probate. Another daughter objects and claims that the propounded instrument was not properly executed and that it was duly revoked by the testator in his lifetime. The sole

issue to be determined is whether the testator revoked his will by tearing or whether it was inadvertently torn by his widow after his death.

The testimony discloses that the testator had been suffering from a heart ailment for several years and that he was apprehensive of an early demise at or about the time he executed his will. His wife was in constant attendance upon him. Their relations were affectionate and harmonious. The draftsman testified that although he had prepared a prior instrument which made provision for testator's children, testator never executed the same, that testator came to him in July, 1942, and told him that as a result of a talk with his wife they had reached an understanding whereby he would leave his estate to her and she in turn would leave everything to him, but if he predeceased her she would dispose of her estate equally to their three children. Her will received in evidence reflected this understanding. It appears that on September 3, 1942, testator's wife went to a local bank and there executed her will in the presence of two witnesses, and after she returned home there was a conversation on the porch between her and her husband, in the presence of their daughter who lived with them and her husband in the same apartment, relative to the necessity or desirability of having a third witness to her will. In connection with this incident the daughter, who has consented to probate, testified that her mother, after getting a Mrs. Wolf to so act, opened her handbag and upon noticing that she gave the intended witness the testator's signed will said, "Oh I made a mistake, I am sorry, that is my husband's will. * * * All I want you to do is to sign my will". That Mrs. Wolf thereupon signed her mother's will. There was testimony given by the widow that on October 19, 1942, when the testator suffered a severe heart attack at a doctor's office in Manhattan, she opened her pocketbook to look for smelling salts, which she carried for emergency use, and observed that both wills were then in there. The next incident concerned with the condition of the propounded instrument took place about three or four days after the testator's death and during the mourning period. The son, testifying with relation thereto, said that his mother called him into the parental bedroom and she told him that there was "a number of papers that she wanted to go through". These papers were in a worn inexpensive black pressed cardboard valise which was kept in the bottom drawer of a chifforobe in the bedroom. Insurance policies and school records belonging to the witness, together

with receipted bills and " personal papers " of the testator, were kept therein. Both the witness and his mother started to tear the papers and after continuing for a while she suggested that he take " the whole thing and throw it out ". The son thereupon took the " box " containing torn and untorn papers to the cellar with the purpose of burning them in the oil burner. However, as it was not lighted at the time he returned with the " box " and put it down, which was the last thing he remembered " of that box ". He further testified that between the time of his father's death and the incident discussed his mother was in a nervous state, cried periodically and took sedatives at the direction of her physician. The widow gave substantially similar testimony with respect thereto. Neither witness stated that the propounded instrument was in the black " box " nor that it was torn by either of them. However, the widow testified that in May, 1943, late in the afternoon, she received a message from her lawyer to look for certain papers which he desired in connection with a pending action. She did not look for the papers immediately but went visiting instead. Upon her return home about half past ten or eleven o'clock she started to search for the requested papers in the black " box " which she had placed on her bed. Her testimony at this point reads in part as follows : " I picked up a couple of pieces, a couple of papers, and I looked and as I was looking I picked up a couple of pieces that had printing on it and I looked and it looked like my husband's will * * * I took the pieces and I put them on the bed and I ran out in the dining room and my son-in-law was with a friend of his playing cards and I ran out and all I could say is, ' Marty, come '." The son-in-law responded to her call and she pointed to the bed where she had placed the pieces that she had been " looking for so long ". Her daughter and the wife of her son also came into the room. Her son-in-law, who had some guests at his home on that evening, gave substantially similar testimony and further stated that he found the piece upon which the subscribing witnesses had written their addresses in a " paper cardboard box " that was about three-quarters filled with paper. He and his mother-in-law laid the several pieces on the bed and tried " to piece it together ". The box referred to by the witness was identified by him and received in evidence. It is the same box referred to by the son and the widow. His wife, the daughter of the testator, testified that when she came into her mother's bedroom she saw torn pieces of paper on the bed and her husband looking over the box and observed a lot of torn

fragments of paper in there, which she had seen on a prior occasion when she and her mother had made a search for the will. The son's wife who was present on the evening in question testified that she went into the bedroom and noticed that " there were many papers strewn on the bed and that black box was there, too ". She made no examination of the papers. The foregoing is a summary of the evidence offered by the proponent concerning the custody and tearing of the instrument and the finding of the torn pieces thereof. The objector called no witnesses and merely introduced in evidence two prior petitions made and filed herein by the proponent. In January, 1943, when represented by another attorney, she filed a petition for probate which contained an allegation to the effect that on September 3, 1942, she went with the testator to a bank in Far Rockaway where she executed her will which together with the testator's will was placed in a safe deposit box. In that proceeding she filed a purported copy and sought to prove that the original was lost or fraudulently destroyed. Several months later she engaged her present attorneys who moved to amend her petition by stating that the will was either lost by or taken from her without her knowledge and consent. While leave to amend was granted, she discontinued the proceeding and thereupon instituted the present proceeding.

The burden of establishing a revocation of the instrument was upon the contestant. If the will had remained in the custody of the testator or the proof established that after its execution he had access to it, the objector would, in the light of its torn condition, be entitled to the benefit of the presumption that he had revoked it *animo revocandi*. (*Matter of Hopkins,* 172 N. Y. 360; *Matter of Frazell,* 174 Misc. 142; *Matter of Ten Eyck,* 155 Misc. 443.) But here the proof is that it passed into the custody of the proponent after he brought it home from his lawyer's office. The objector has failed to retrace it to his possession. With respect to the time and manner of its injury I accept as true the version given by the proponent and her witnesses. In the light of the provisions of the will it is unreasonable to assume that the widow would destroy or attempt to destroy it in the lifetime of the testator. Mutilation after death impresses me as a more reasonable conclusion. I am satisfied, upon the evidence, that the instrument was torn at the time testified to by her and her son and that the pieces, now produced, were later found in the box as related by her and the other witnesses who went into her bedroom on the evening aforemen-

tioned. The fact that her son and her daughter gave testimony in hostility to their own interests cannot be overlooked in arriving at a conclusion. The proof is conclusive that the instrument was properly executed and at a time when the testator was competent and free from restraint. The contents of the missing parts have been fully established by the production of a copy and the testimony of the draftsman. The propounded instrument will be admitted to probate. Its provisions should be incorporated in and established by the decree. Proceed accordingly on notice.